Please be seated. Good morning. Before we begin the argument calendar, a couple of preliminary matters. The first is that Judge Bennett and I welcome and thank Judge Kobayashi from the District of Hawaii, who is here to help us with our busy docket, and we very much appreciate having you with us. We also have three cases that are submitted on the briefs at this time, and those are Sano, Florian v. Sessions, Rutt v. Ross, and Ornelas v. Sessions. And I also want to welcome students, I think, who are here from Mission High School. Am I right? You made it. Good. We will, after arguments, go back and have our conference, and our law clerks will talk with the students while we're in conference. Then we'll come back and chat with you as well, and any lawyers who want to remain are welcome to remain. We, of course, won't talk about any actual cases, these or any others that are before the court, but we'll look forward to chatting with you later. With that, we'll begin with Singh v. Sessions. Good morning, Your Honors, and may it please the Court. My name is Morgan Russell for the Petitioner, Pardeep Singh. This is a petition for review of a Board of Immigration Appeals denial and affirmance of the immigration judge's adverse credibility determination. There is two areas, two separate areas of testimony that the immigration judge took issue with and which the BIA upheld. The first has to do with when the petitioner learned the name Gogi Singh, who was sort of the driving force in Petitioner's village behind persecution of his family over a number of years. The IJ fixated on the fact that Petitioner's declaration used the name, the words, Gogi Singh to refer to this individual in describing past events, even though the petitioner testified that he only learned that this individual's name was Gogi Singh in October 2011 when he himself was first attacked. But there is no reason that the declaration should have prefaced every description of past events with some sort of phrasing like, I later learned that such and such occurred, and no reason that he should have prefaced every reference to this individual who was going after his family with who I later learned was named Gogi Singh or something like that. Indeed, in paragraph 5 of the declaration at page 324 of the record, he does state and sort of prefaces his whole later narrative by saying, I later learned that Gogi Singh is a Congress Party member and worker who is rich and influential and who uses his financial and political influence to threaten others. The declaration doesn't say one way or another when he learned the identity of this person. And so the IJ's whole premise of the declaration is sort of fundamentally inconsistent with his testimony in this respect. I don't think it's accurate. I think that mischaracterizes the record. The BIA rejected that same argument, correct? Right, and that's why we're here. Yeah. They just adopted and affirmed the IJ's decision, so I think we're really mainly looking at the IJ's decision here. I don't think they added any kind of better defense of it than the IJ gave. You know, this declaration is plainly going through these events and describing these events from his perspective when he sat down with the preparer to prepare it in 2014. This isn't, you know, this isn't Portrait of the Artist as a Young Man where he's trying to recreate only the knowledge and language he had at his disposal as the events occurred in time. You know, I don't think there's any reason that the court or anyone would expect someone to describe things in that way. He now knows it's Gogi Singh. He now, this whole sort of narrative is crystallized in his head. He has much more information, and he describes it using the information he had from his sort of more fully informed point of view. I don't think there's anything. Well, one of the things that the IJ talked about was Paragraph 13 of his declaration where he says, at home my mother, uncle, and brother talked about how they believed it was Gogi Singh and members of the Congress Party because they had threatened my father. Why is the IJ and the BIA wrong in saying that's just simply inconsistent with his actual testimony? Well, again, we don't know. We don't know from the declaration when he found that out. We don't know from the declaration. Well, yes, we do. If you look at Paragraph 13, it specifies August of 1998 and states that his mother, uncle, and brother talked about how they believed it was Gogi Singh. So that seems to just a natural reading of Paragraph 13 is that in August of 1998, his family members talked about this person by name. That's the most natural reading of that paragraph, is it not? I think perhaps it's a reading of it. I don't think that we know. I don't think the declaration is at all clear. Is it a permissible reading of it? Well, I guess I would point. That's a yes or no question. Do you think it's a permissible reading? Sure. Well, if that is the case and our review is pretty constrained, why don't we have to uphold the BIA's determination in that regard? Well, I think under the totality of the circumstances here, which is what the Real ID Act requires and his explanation that he knew it was a Congress Party member, but he never heard the name before, and especially in light of the fact that his declaration explains that. I mean, there's nothing, you know, neither that nor anything else says that he was, you know, he heard those conversations at the time or was involved in those conversations at the time. And, in fact, I think sort of consistent with his statements in his testimony at the hearing that he didn't, you know, he didn't know this name earlier, is the uncontroverted statements in his declaration that he was in denial about his father's death and was sort of avoiding confronting this whole issue for years. That also, you haven't mentioned yet the other inconsistency or ground for the adverse credibility finding, which is that he testified about having been stabbed in the head and having a gash on his head, and the doctor notes, to the extent they're legible, all refer simply to swelling of the body and there's no mention of a cut or stab wound. Right. So as to that issue, I'm happy to move on to it now. So in Wren and other cases, this Court has held that adverse credibility determinations that are based on mischaracterization of the record are impermissible. And here the I.J. repeatedly mischaracterized the record in describing this event. So as Your Honor just said, used the phrase, he was stabbed in the face, that's the I.J.'s language. That's not what happened. That's not what he ever said. What did he say specifically? He said he was cut. Okay. And the I.J. says that it's remarkable, it's, you know, it's astonishing that he would not mention being stabbed in the face. But a stab is a fundamentally distinct and different thing than being cut in the forehead. A stab is a puncture wound. It's a different kind of thing. The I.J. consistently, in the premise of his finding this something that's significant enough to hold the Respondent not credible. Counsel, but in paragraph 23 of his declaration, he says, he tried to cut my face, cut me on the forehead over my right eye. I still have a scar there. I started bleeding very heavily and became dizzy. Exactly. He cut me. A cut is different from a stab. A cut is when you draw a knife or a blade across something. A stab in the face is very different. The I.J. is taking his premise that this was a, quote, major wound, even though it didn't require stitches, that it was a stab wound, even though it was not. There's no, no one ever said it was a stab wound. Okay. So there's a different characterization. So just assume you're right that the I.J. mischaracterized it. Still, he testified about having the village doctor visiting him, re-bandaging it several times. So I think we can all agree it was an insignificant wound. And yet there's really no mention of it in the written submission from the doctor. Right. Which is curious to me. I don't know why it was submitted at all. But now it creates this inconsistency or it's silent as to what the Petitioner is representing. Right. And I think that's the key. I mean, it's silent. It doesn't corroborate that aspect of the treatment. It doesn't corroborate that aspect of the injury. But I think this falls squarely under this Court's decision in Battarai. Like the police report at issue, like in that case, or the police letter at issue in that case, it corroborates one aspect of his testimony and doesn't corroborate another aspect. But where it's just silent on that, he had to have an opportunity to get corroboration from the doctor to see if the doctor could have corroborated it. Well, that's true only if he had otherwise given credible testimony. The cases make clear that that opportunity isn't unlimited, that if the testimony isn't credible to begin with, there doesn't have to be that opportunity. Right. And so, but if this Court were to my colleague filed a 28-J letter concerning Wong, and so if this Court otherwise upholds, say, upholds on the first ground, then I agree that it wouldn't have to go back for this. But my position is that it should not uphold on the first ground concerning the name, and this has to go back because of this violation of Wong, I think, or violation of the Ryan notice and opportunity requirement. Did you wish to save any rebuttal time? Yes, I'll try to save this last minute. Thanks so much. Good morning, Your Honors. May it please the Court, Alexander Lutz for the government. Your Honors, substantial evidence supports the adverse credibility finding the Court's reviewing today, where the record plainly contains the key inconsistencies on which the agency relied. First, Mr. Singh testified that he had never heard the name Goji Singh, the name of the person who was allegedly responsible for his father's disappearance, his brother's kidnapping, and the Petitioner's own beating, until the Petitioner himself was beaten on October 26, 2011. But his brother testified exactly to the opposite. His brother, Gurwinder, said, the second day I was released from his own kidnapping, which was months earlier, in the preceding July of the same year, 2011, that's when I talked. And that's when, in the context of that conversation, he's talking about when he discussed the events he'd just been through, and he said, as part of that discussion, you know, I mentioned the name Goji Singh. So right there, we've got an inconsistency between the Petitioner's own testimony and his brother's testimony about when he learned the name of this key figure. And furthermore, we've got the inconsistency between Mr. Singh's testimony and his declaration. And I know that was just discussed pretty extensively, so I'll just touch on that briefly. The immigration judge and the board both plainly looked at the explanation for that inconsistency that Mr. Singh offers here today, which is that the declaration was post hoc prepared based on information he learned at a later date. The immigration judge already considered and rejected that explanation. So the question now isn't whether that explanation is theoretically plausible. It's whether the record would compel any reasonable fact finder to accept it and to reverse this agency's decision. This is a permissible view of this declaration. It's written in chronological order. It mentions Mr. — it mentions Goji Singh ten times before the Petitioner even gets to the description of his own — his own beating at which he claims to have first learned that person's name. And at paragraphs 13 and 14, he discusses Goji Singh's name in ways that naturally read suggest that he — he learned that name at a time before he himself was beaten. So where this inconsistency is plain on the face of the record, where the agency considered all these explanations that Mr. Singh offers now, the record can't compel reversal on that basis. Turning to the second ground having to do with the head wound, Your Honors, I — whether it was a stab or a cut, I think that's a distinction without a difference here. Because the issue is that he testified that it was a severe injury that he suffered. He said he was drenched in blood and it was a wide, deep cut or something along those lines. That's exactly right, Your Honor. He said at page 143, I was in a lot of pain. I felt the blood. I felt the blood on my face, on my body, on my clothes. Question, so you were drenched in blood? Answer, yes. And that's just one part of a long colloquy where he discusses how serious this injury was. He was specifically asked, question, of the various injuries that you suffered during this attack, this was the worst injury or there was another one that was as bad or worse than this? Answer, yes, this was the biggest. They kicked me in the stomach, too, and because of that there was blood coming in my urine. And then he goes on to describe how he had to have a medicated bandage wrapped around his head repeatedly and that the doctor came to his house five or six times to do that. Where is any of that in the doctor's notes? Where is any of that in the credible fear interview? That's a serious omission or an inconsistency about what the immigration judge fairly described as a serious knife wound. So where we're talking about the presence or absence of any mention of this injury in these documents, I think whether the immigration judge described it as a stab or a cut really is such a trivial distinction. It's just not mentioned at all either as a stab or a cut in these documents. And turning, Your Honors, to Mr. ---- I'm sorry. With the immigration judge, he did take into account the fact that perhaps, you know, in taking the credible fear notes, maybe the interviewer didn't hear it or whatever. So he did credit that. But do you think he credited sufficiently or at all with regard to the doctor's letter, the fact that it was prepared over a year later, that perhaps, you know, this village doctor being at a very, you know, basic level may not have kept the kind of medical records that one could look back at? And so he was piecing together the best he could. So the silence as to the head wound was because lost to time and memory, and that's something that the I.J. should have credited? The immigration judge absolutely did credit that, Your Honor. At pages 72 to 73 of the record, the immigration judge considered a variety of explanations, including that the doctor didn't write anything down and that the doctor was a village doctor. So the limitations on this document absolutely were considered. And now the question is, would this record compel any reasonable fact finder to reach an opposite conclusion? It would not. And, Your Honors, I'd like, if I could, just to turn to the Wren argument that Mr. Singh raised in briefing and raised just a minute ago. Even if we set aside for a minute the other inconsistency about when Mr. Singh learned about the name Goji Singh, even if we just confine our review for a minute to the head wound inconsistency, Wren still doesn't apply here. First of all, that argument's unexhausted. And in response to that point in our answering brief, Mr. Singh points out that Badarai came out after his, after the agency's decision. But Badarai was an application of this Court's Wren holding, and Wren came out years previous. So if Mr. Singh wanted to make a Wren argument after the immigration judge rendered his decision, if Mr. Singh wanted at that point to say, hang on, the immigration judge should have given me notice and an opportunity to obtain further corroboration, could have absolutely done that under Wren in the brief to the Board, and he didn't do it. So at this level, it's unexhausted. But even setting that aside, Badarai is still inapplicable. Because in Badarai, the Court was stepping through its Wren analysis, and it was looking at particular documents at issue in that case. And it wasn't purporting to create a broad new rule. It was just applying Wren. And in doing so, it looked at a letter that the Petitioner in that case had submitted, and it was a letter from a police inspector. I'm quoting actually now. A letter from a police inspector verifying that Badarai was the victim of an attack. The immigration judge had seen that letter as having been inconsistent with the Petitioner's testimony, but in the process of sorting between inconsistencies and findings that are more in the nature of corroboration, the Court said, well, that letter didn't provide details of Badarai's assault. And therefore, if the question is his testimony did discuss this and the letter did not provide details, that's really more of a corroboration finding. But here, the doctor's note that Mr. Singh submitted did provide details. It did discuss the dispositive issue with respect to this inconsistency, which is what were the injuries Mr. Singh sustained and what was his treatment for them. The doctor's note did absolutely discuss those. That was the whole point of it. And it said, well, he had swelling of the body and he received an injection of teramicin. That description of his injuries and the treatment he received is inconsistent with his subsequent testimony that he suffered this knife wound that caused him to be dredged. Sotomayor Why would he have received this? This is going beyond my area of expertise, but I think that teramicin is some sort of an antibiotic. And if that is correct, why would he have received that for swelling if he had no cut that could become infected? Well, Your Honor, I'll admit that's beyond my area of expertise, too. But even just accepting for a minute that it is an antibiotic, perhaps an antibiotic is important to treat swelling of the body. I mean, I think swelling, inflammation, that could be caused by an infection. But the fact that we're both kind of venturing into speculative territory here to try to figure out why he might have taken teramicin. I mean, the fact that we have to even venture into that speculative territory shows that substantial evidence in the record supports the agency's finding. Because on the basis of the record as it exists, the agency reached a permissible conclusion that where Mr. Singh testified about this wound, but it wasn't mentioned in the supporting documents, that is an inconsistency. And, you know, Your Honor, I think your question kind of goes to Mr. Singh's attempts to – well, his strategy after this inconsistency came up was to, in briefing, attempt to impeach the doctor, frankly, to discuss the limitations on this letter and how it was prepared later and what we could try to discern from it. But again, the immigration judge considered the limitations of this document, considered fairly what it said. So would he have been more credible if he had not presented a doctor's note at all? It's hard to say, Your Honor. I think he certainly would have avoided part of this problem. He still would have had to contend with the inconsistency between his testimony and his credible fear interview. But the fact is he did submit the letter. He offered it as supporting his burden of proof. When he put that into evidence, he was suggesting that this was going to help his claim. He's got to stand behind it at that point. And so where it then creates an inconsistency, that's the record the agency has to deal with, and that's the record that we have to look at now as supporting or not supporting the agency's decision. This inconsistency pretty clearly is plain on the face of the record. Just turning back to the Wren argument, Your Honors, I just want to make one final point there. As Judge Grabers, you pointed out a moment ago during Petitioner's presentation, the Wren doctrine doesn't apply unless the applicant's testimony is otherwise credible. And so right away, Wren's distinguishable. But even if we get through that first hurdle, then what Wren requires is that if the immigration judge is going to fault the Petitioner for failing to submit corroborative information, he's got to give notice and opportunity to obtain the document or explain why it can't be obtained. Here, the immigration judge said at page 75, the Court certainly cannot fault the Respondent for failing to provide corroborative evidence. He explicitly said corroboration wasn't an issue. For those reasons, Wren is distinguishable. I was just going to say thank you. Thank you, Your Honors. We respectfully request the Court to deny the petition for review. Mr. Russell, you have some rebuttal time. So on the Wren issue, it absolutely is exhausted, although I would say not for the reason we stated in our reply brief, but because it's jurisdictional and I can point it out now. This Court has held in Xi and in Wren itself, that's Xi ZHI 751 F3rd 1088 at 1094 Note 5, and also in Wren 648 F3rd at 1084, that this notice and opportunity issue is a sub-issue of the credibility analysis and a challenge to credibility, which certainly happened here, particularly where there was a challenge to the BIA of the analysis of this document. Absolutely exhausts for this Court the notice and opportunity argument. So it's certainly before the Court. My colleague stated that because the IJ said this was a credibility issue and not a corroboration issue, that means this doesn't fall under Wren or Badarai. That's not right. That's not at all how the Court has looked at it. In Badarai, there was a whole discussion of how, although it was framed by the agency as credibility, they're going to address it under corroboration under the Wren Doctrine. Thank you, counsel. The case just argued is submitted for decision, and we very much appreciate helpful and excellent arguments by both counsel.
judges: Graber, Kobayashi, Bennett